Argued September 17, remanded October 7, 1919.

## LJUBICH *v.* WESTERN COOPERAGE CO.

### (184 Pac. 551.)

**Ambassadors and Consuls—Consul General may Authorize Action on Behalf of Citizen of His Country.**

1. Under treaties between the United States and Austria-Hungary, which contained the usual most favored nation clause, and treaties between the United States and other countries, *held* that consul general of Austria-Hungary might authorize attorneys to institute action on behalf of an Austro-Hungarian national where conditions were such, because of the war between Austria-Hungary and other countries, that it was practically impossible for the national to directly authorize the institution of the action.

From Multnomah: CALVIN U. GANTENBEIN, Judge.

Department 1.

This action was originally instituted by and in the name of Yoze Ljubich to recover damages, under the Oregon Employer's Liability Act, against the defendant for the death of Yure Ljubich through the alleged negligence of defendant. Deceased was killed on the thirteenth day of September, 1915, and the complaint was filed March 1, 1916. The complaint is in the usual

form and alleges that plaintiff is the mother of deceased. Under the statute, the right to bring the action is concededly in the mother. The complaint was verified by the attorneys for plaintiff, to the form or substance of which there is no objection.

On the twenty-second day of March, 1916, defendant's attorneys filed a motion, supported by affidavit, requesting the court to require plaintiff's attorneys to produce the authority under which they claimed to act for plaintiff. The affidavit set forth that affiant was informed and believed that other attorneys in the City of Portland were representing the mother, and that Woerndle and Haas, who claimed to represent her, have no other authority than the direction of the Austrian-Hungarian Consul at San Francisco to bring this action in the name of the mother. No action was taken by the court until January 12, 1917, the case having meantime been put at issue and the attorneys for the plaintiff having filed an affidavit, showing that the jurisdiction of the Imperial Consul of Austria-Hungary at San Francisco embraced the State of Oregon; that affiant knew of no one in Oregon representing the plaintiff; that no definite power of attorney had been secured, authorizing affiant to institute the action, because of war conditions in that part of Europe where plaintiff was residing, which conditions rendered it impracticable to procure legal documents and forward them; that plaintiff's attorneys instituted the action, pursuant to instructions from the Consul-General representing Austria-Hungary, which authorization was attached to the affidavit and which was sufficient in form and substance to authorize plaintiff's attorneys to act if the Consul-General had power to so direct. Thereupon the court, holding that the letter of the Austrian Consul-General was not suffi-

cient authority to enable the attorneys to institute the suit, ordered proceedings stayed until they should produce further authority which, being unable to do, they appealed to this court, and while the appeal was pending here, war was declared between Austria-Hungary and the United States.       REMANDED.

For appellant there was a brief over the names of *Mr. C. T. Haas* and *Mr. Joseph Woerndle,* with an oral argument by *Mr. Haas.*

For respondent there was a brief over the names of *Messrs. Senn, Ekwall & Recken* and *Mr. Dan J. Malarkey,* with an oral argument by *Mr. F. S. Senn.*

McBRIDE, C. J.—Upon the argument here, counsel have presented the single question, namely: The right of the Consul-General of Austria-Hungary, under any circumstances, to authorize an action to be commenced in the name of a national without express authority from the person named as plaintiff in such action. The contention of plaintiff's attorneys, when reduced to its plainest terms is, that the Consul, by virtue of his office and the treaty between the United States and Austria-Hungary was, in effect, the official attorney in fact of all nonresident aliens who were not represented by an attorney in fact of their own selection, and, as such, was authorized to employ attorneys and institute proceedings to defend or enforce the rights of any of his nationals not otherwise represented. Such right being denied by defendant and its contention being sustained by the court, we will now proceed to consider the point at issue.

For a proper understanding of the question it will be necessary to examine and consider the various

treaties bearing upon the subject of the rights of foreign consuls accredited to this country, and the reciprocal rights of consuls of our own country abroad.

Article II of the treaty of August 27, 1829, between this country and Austria-Hungary, reads as follows:

"The citizens or subjects of each party shall have the power to dispose of their personal goods within the jurisdiction of the other, by testament, donation or otherwise; and their representatives being citizens or subjects of the other party, shall succeed to their personal goods, whether by testament or *ad intestato,* and may take possession thereof, either by themselves or by others acting for them, and dispose of the same at their will, paying such dues, taxes or charges only, as the inhabitants of the country, wherein the said goods are, shall be subject to pay in like cases."

The following articles of the consular convention, entered into between this country and Austria-Hungary on June 29, 1871, also have an important bearing upon the question here discussed, and are as follows:

"Art. VIII. Consuls-General, Consuls, Vice-Consuls, or Consular Agents of the two countries may, in the exercise of their duties, apply to the authorities in their district, whether federal or local, judicial or executive, in the event of any infraction of the treaties and conventions between the two countries; also for the purpose of protecting the rights of their countrymen. Should the said authorities fail to take due notice of their application, they shall be at liberty, in the absence of any diplomatic representative of that country, to apply to the Government of the country where they reside.

"Art. XVI. In case of the death of a citizen of the United States in the Austro-Hungarian Monarchy, or a citizen of the Austro-Hungarian Monarchy in the United States, without having any known heirs or testamentary executors by him appointed, the competent

legal authorities shall inform the Consuls or Consular agents of the state to which the deceased belonged, of the circumstances, in order that the necessary information may be immediately forwarded to the parties interested.

"Art. XV.    Consuls-General, Consuls, Vice Consuls, and Consular agents, also Consular Pupils, Chancellors, and Consular Officers shall enjoy in the two countries all the liberties, prerogatives, immunities and privileges granted to the functionaries of the same class of the most favored nation."

The effect of the last clause above quoted was to import into the treaty of June 29, 1871, every reciprocal concession granted to any nation by any treaty then or thereafter concluded; and in order to ascertain what provisions or other stipulations were, by the "most favored nation" clause of the Austria-Hungarian convention incorporated into it, we quote the following excerpts from various treaties between this country and other nations.

Article IX of the treaty of 1853 between the United States and the Argentine Republic, is as follows:

"If any citizen of either of the two contracting parties shall die without will or testament, in any of the territories of the other, the Consul General or Consul of the nation to which the deceased belonged, or the representative of such Consul General or Consul, in his absence, shall have the right to intervene in the possession, administration and judicial liquidation of the estate of the deceased, conformably with the laws of the country, for the benefit of the creditors and legal heirs."

The treaty entered into between the United States and the German Empire December 11, 1891, contains the following provision:

"Art. VIII.    Consuls-General, Consuls, Vice-Consuls and Consular Agents shall have the right to apply

to the authorities of the respective countries, whether Federal or Local, judicial or executive, within the extent of their consular district, for the redress of any infraction of the treaties and conventions existing between the two countries, or of international law; to ask information of said authorities and to address said authorities to the end of protecting the rights and interests of their countrymen, especially in cases of the absence of the latter; in which cases such consuls, etc., shall be presumed to be their legal representatives. If due notice should not be taken of such application, the consular officers aforesaid, in the absence of a diplomatic agent of their country, may apply directly to the government of the country where they reside.''

The treaty between the United States and Peru, dated August 31, 1887, contains the following provision:

''Until the conclusion of a consular convention which the high contracting parties agree to form as soon as may be mutually convenient, it is stipulated that in the absence of the legal heirs or representatives, the Consuls or Vice Consuls of either party shall be *ex-officio* the executors or administrators of the citizens of their nation who may die within their consular jurisdictions, and of their countrymen dying at sea, whose property may be brought within their district.'' (Art. 33.)

Article III of the treaty of August 6, 1900, between the United States and Great Britain, is as follows:

''In case of the death of any citizen of the United States of America in the United Kingdom of Great Britain and Ireland, or of any subject of Her Britannic Majesty in the United States, without having in the country of his decease any known heirs or testamentary executors by him appointed, the competent local authorities shall at once inform the nearest Consular Officer of the nation to which the deceased person belonged of the circumstances, in order that the

necessary information may be immediately forwarded to persons interested.

"The said Consular officer shall have the right to appear personally or by delegate in all proceedings on behalf of the absent heirs or creditors, until they are otherwise represented."

In the consular convention between the United States and Sweden, March 20, 1911 (37 Stat. 1487), we find the following provision:

"Art. XIV.   In the event of any citizen of either of the contracting parties dying without will or testament, in the territory of the other contracting party, the Consul-General, Consul, Vice-Consul-General, or the Vice Consul of the nation to which the deceased may belong, or in his absence, the representative of such Consul General, Consul, Vice-Consul-General or Vice-Consul, shall so far as the laws of each country will permit, and pending the appointment of an administrator, and until Letters of Administration have been granted, take charge of the property left by the deceased for the benefit of his lawful heirs and creditors, and moreover, have the right to be appointed as administrator of such estate."

From the above provisions we are of the opinion that the Consul-General of Austria-Hungary becomes *ex-officio* attorney in fact for any of his nonresident nationals having no other representative in this country, and while there is a dearth of authority directly deciding this question, there are a number of cases so analagous to it in principle as to render the conclusion above announced inevitable, and such is the result deduced by the text-writers from a review of the authorities.

"A foreign consul, without specific authority, has the general right to protect the rights and property of persons of his nation, within the jurisdiction of his consulate, and he may bring suits for such purpose

without any special authority from the parties in interest. He may also interpose claims for the restitution of property belonging to his countrymen; but he cannot receive the actual restitution of the property without specific proof of the individual proprietary interest, and without specific authority from the particular individual who is entitled to it": 2 C. J. 1307, § 35. To like effect see 9 R. C. L. 157, subd. 4.

It may be remarked here that the statement, that a consul cannot receive actual restitution of property awarded to a nonresident national without specific authority from the individual entitled to it, seems to be based upon the decision in the case of *The Bello Corrunes,* 6 Wheat. 152 (5 L. Ed. 229, see, also, Rose's U. S. Notes), which arose before any of the treaties before quoted were negotiated and where it was expressly conceded by Webster, of counsel for the Consul, that actual payment of the sums claimed by the Consul on behalf of his countrymen need not necessarily be made to him—his object being to have the award paid into the registry of the court to be held for those entitled to it as their interests might thereafter appear, and such was the decree of the court. No reference was made in the arguments or in the opinion to any consular privileges or authority arising out of treaty stipulations, and the case is not in point here, where such stipulations are invoked on behalf of the Consul's authority.

When this action was commenced this government was at peace with Austria-Hungary and with Germany. In the treaty with Germany, heretofore referred to, occurs this paragraph applicable to consuls of both countries:

"Especially in cases of the absence of their countrymen such consuls shall be presumed to be their legal representatives."

The term "legal representatives" as here used can
have but one meaning, namely: "Lawfully entitled to
represent" the absent person. Under the "most
favored nation" clause of the Austria-Hungarian
treaty, this provision originally applying to Germany,
became a part of the treaty with Austria-Hungary
and, in our opinion, conferred full authority upon the
Consul-General to commence this action in the name
of the plaintiff, and in her name and for her to prose-
cute it to a conclusion and receive the proceeds if the
plaintiff should recover judgment.

In the case of *Succession of Rabasse,* 47 La. Ann.
1452 (17 South. 867, 49 Am. St. Rep. 433), which in-
volved the right of a delegate of the French Consul
to appear and represent nonresident heirs in the set-
tlement of a probate proceeding, the court said:

"In our view, the stipulation in this treaty puts the
delegate in the position of an agent of the French
heirs, with the same effect as if he held their mandate
to represent them as heirs. * * Our decision in this
case affirms that the French heirs of this succession
are to be deemed represented by the delegate of the
French Consul, with the same effect as if the delegate
held their power."

In *Vujic* v. *Youngstown Sheet & Tube Co.* (D. C.),
220 Fed. 390, it was held that the Austro-Hungarian
Consul had authority by virtue of his office to sue as
next friend for absent heirs, and to recover moneys
due them under the Workmen's Compensation Act,
on account of the death of their father.

*In Re Tartaglio's Estate,* 12 Misc. Rep. 245 (33 N. Y.
Supp. 1121), the litigation arose upon the demand of
the Italian Consul-General to have paid over to him
the distributive shares due the nonresident widow and
children of the deceased. The county treasurer, who

was custodian of the fund, refused to pay over the money upon the ground that the Consul-General had no authority to receive the fund and give a competent acquittance for the same. The clause in the treaty with Italy, relied upon by the Consul, provided that the Consuls-General "may have recourse to the authorities of the respective countries within their respective districts, whether federal or local, judicial or executive, in order to defend the rights and interests of their countrymen." The court held that the term "defend" used in the treaty should be so construed as to grant the power to proceed affirmatively; that the Consul-General had the right to demand and receive the money, and that his receipt therefor would be conclusive against the heirs. There was the same holding *In Re Fiorentino's Estate* (Sur.), 89 N. Y. Supp. 537.

Both of these cases are surrogate decisions and not authoritative, but appear to proceed upon sound lines of reasoning. There are many cases wherein the right of priority of consuls to be appointed administrators is discussed, but these proceed upon different principles and throw little light upon the present controversy. Here no one is claiming to have any authorization direct from plaintiff to proceed in the matter. Considering the disturbed state of affairs in Europe for the past four years, it appears highly improbable that the plaintiff could have been communicated with or that she could have executed and sent a formal power of attorney to the Austria-Hungarian Consul, or anyone else. In the meantime witnesses might disappear or die and the plaintiff thereby lose the benefit of their testimony. So upon the face of it, the interposition of the Consul-General would appear fairly within the line of his duties in the premises.

What would be the effect of the plaintiff appointing another attorney to represent her does not arise in this case. The writer can see no reason why she may not do so and thereby supersede the authority of the Consul-General, or his successors; but this would be at present a moot question and need not be further discussed. The contention of counsel for respondent is to the effect that the law gives the right of action to the mother, and that contention is correct. His further contention that, because the Consul-General caused this action to be instituted the mother has not instituted it, rests wholly upon the assumption that the Consul-General is not the agent of the mother, and having shown, as we believe, that by virtue of the treaty he is such agent, respondent's contention fails.

It follows that the order of the Circuit Court, staying the proceedings, must be set aside and the cause remanded to the Circuit Court, with directions to proceed in a manner not inconsistent with this opinion.

REMANDED.

BURNETT, BENSON and HARRIS, JJ., concur.

BURNETT, J., Concurring Specially.—Under the original Constitution of this state the Supreme Court has jurisdiction to revise only final decision of the Circuit Courts: Oregon Const., Art. VII, § 5. Although the amendment of this article adopted by the plebiscite of November 8, 1910, permits legislation changing this rule, none has yet been enacted. The order staying proceedings in this case until the attorneys appearing for the plaintiff should produce authority to act for her was purely interlocutory and not final. There is nothing about it which would have prevented the plaintiff from going on with the trial of the action, and ·

pursuing it to final judgment the next day or at any subsequent time, represented by the same or other attorneys or appearing in person, provided of course the authority of the attorneys so to act was made to appear. The order does not determine any issue in the case or prevent a final judgment in the action within the meaning of Section 548, L. O. L., as amended by Chapter 88, Laws 1915, defining appealable orders. Although erroneous, it is not every determination of an inferior court that is appealable. Appeal does not lie as of right in all cases. It depends entirely upon the statute allowing it and is not to be extended to orders not within the enabling statute. The order under consideration is not one from which an appeal will lie, because it is not final. We are confronted with a moot question only. On the hypothesis that this court has jurisdiction to review such an order, which I do not concede, I concur in the reasoning of Mr. Chief Justice McBride to the effect that a foreign consul has presumptive authority to represent his nonresident countrymen in the courts of this country, my contention being that the question is not properly before us.

---

Motion to dismiss appeal denied conditionally September 21, 1918.
Argued on the merits September 30, affirmed October 14, 1919.